OPINION
 

 ROBERT L. CARTER, District Judge.
 

 Plaintiff Wisser Company (“Wisser”) has brought this action under the Petroleum Marketing Practices Act (“PMPA”), 15 U.S.C. § 2801
 
 et seq.,
 
 to enjoin defendant Texaco Inc. (“Texaco”) from ceasing to supply it with Texaco oil. Wisser, which in turn supplies refined oil to area service stations under the Texaco brand name, has moved for a preliminary injunction to prevent Texaco from cutting off supplies on June 30,1981, as is currently planned. Texaco has agreed to maintain the status quo pending court determination of this motion.
 

 STATEMENT OF FACTS
 

 On June 25, 1969, Wisser and Texaco entered into a distributorship agreement of three years’ duration
 
 [1]
 
 according to which Texaco was to deliver certain amounts of gasoline and motor fuels to specific identified service stations that were owned, controlled or leased by Wisser to third parties. On February 5, 1972, Texaco informed Wisser that it was terminating the agreement effective May 5, 1972. However, on May 5, 1972, the parties entered into a letter agreement that extended Wisser’s supplies of Texaco oil until December 31, 1972. The letter also recited that Wisser’s and Texaco’s business relationship would be terminated on December 31, 1972, that no claims or litigation would result from such termination, except as specifically provided for in the agreement, and that the agreement “shall not be deemed a waiver of Texaco’s notice of termination to Wisser dated March 29, 1972, or a renewal of the Agreements referred to therein.” (Agreement of May 5, 1972, ¶ 4). However, following this “termination” Texaco and' Wisser extended their business relationship by a series of agreement addenda dated October 20, 1972, July 24, 1973, August 30, 1974, December 30, 1974, October 7, 1975, February 9, 1976, September 30, 1976, March 3, 1977, May 4, 1978, January 2, .1979, August 3, 1979, January 15, 1980, June 17, 1980, and January 5, 1981. The October 20, 1972 agreement addendum recited that “by October 1, 1973 there will be no further supply of Texaco products;” and the July 24,1973 addendum stated that “by April 1, 1974 there will be no further supply of Texaco products.”
 

 During January, 1974, while the WisserTexaco relationship was being continued by a series of approximately six-month extensions, the Department of Energy’s Mandatory Petroleum Allocation Regulations, 10 C.F.R. § 211, took effect and prohibited Texaco from cutting off supplies to Wisser or its other distributors. Each addendum from August 30,1974, onward contained the following language:
 

 Wisser will be supplied by Texaco with its products until [the applicable termination date], with the understanding that said supply will be subject to the Federal Energy Administration Petroleum Regulations [the Mandatory Allocation Regulations] insofar as they are in effect and may be applicable. If said Regulations are still in effect as of [the above termi
 
 *723
 
 nation date], and, under their normal application Texaco would otherwise be required to continue furnishing Wisser with product, it is not the intention of the parties that this agreement will supersede the regulations. In such event it is contemplated that during [the period immediately preceding the above termination date], this Agreement will be reviewed and extended for a short period of time to be fixed by Texaco, Inc. . .. It is further understood and agreed that in the event the Federal Energy Office Petroleum Regulations are rescinded or discontinued, Wisser will phase out their purchases so that their monthly volume will not exceed 700,000 gallons, and by [the applicable termination date] there will be no further supply of Texaco products.
 

 Late in January, 1981, the President revoked the Mandatory Allocation Regulations in their entirety. Texaco now asserts that but for the Mandatory Allocation Regulations it would have terminated the relationship with Wisser long ago. On February 18,1981, it served notice of its intention to terminate on June 80, in accordance with the January 5 addendum. Wisser seeks in this action to prevent the proposed termination on June 30.
 

 DETERMINATION
 

 The initial question is whether the PMPA’s proscriptions against termination and non-renewal of franchises and franchise relationships, 15 U.S.C. §§ 2801-2805, apply to the Wisser-Texaco distribution arrangement.
 

 Texaco denies that any franchise or franchise relationship presently exists but concedes that a franchise existed between 1969 and 1972 by virtue of the distributorship agreement then in force. It contends, however, that the franchise was terminated in 1972 and not reinstated by either the May 5, 1972 letter agreement or any of its subsequent addenda. The gist of Texaco’s position is that its renewals of Wisser’s gasoline supply were always intended to be temporary and not to establish or continue a franchise within the meaning of the PMPA, .and that the longevity of its relationship with Wisser has been the result of coercion by the federal government. Texaco argues that since franchises are contractual in nature, government-induced compulsion to continue supplying gasoline cannot create a franchise.
 

 It is clear that the relatively short renewal intervals of Wisser’s supply, generally being around six months each, do not negate the existence of a franchise relationship. Some courts have found such a relationship on the basis of nothing more than a month-to-month tenancy established by state law.
 
 See Brach v. Amoco Oil Company,
 
 slip op., 80 Civ. 4197 (N.D.Ill. October 24, 1980);
 
 Munno v. Amoco Oil Company,
 
 488 F.Supp. 1114 (D.Conn.1980). Moreover, the legislative history of the PMPA demonstrates that Congress was especially concerned with the potentially coercive effects of oil companies using short renewal intervals coupled with impending threats of termination.
 
 [2]
 
 Given these expressions of concern, it is most unlikely that Congress would have intended the terms “franchise” and “franchise relationship” to exclude supply arrangements supported by frequent and ostensibly temporary renewals.
 

 Texaco’s more substantial argument is based on the alleged involuntariness of its role in supplying Wisser with gasoline. The fact that Texaco now seeks to terminate supplies to Wisser is persuasive evidence that its role has become involuntary. How
 
 *724
 
 ever, it is difficult to pinpoint exactly when their consensual relationship expired. Beginning May 5, 1972, each agreement purported to set a final termination date to the business relationship. However, three such agreements were signed, each with a different final termination date, before there was any indication of government compulsion to continue supplies. It appears likely that sometime between January 15, 1974, when Mandatory Allocation Controls became effective, and February 18, 1981, when the notice of termination was served, the relationship ceased being a voluntary contractual one.
 

 However, if this happened after June 19, 1978, the effective date of the PMPA, Texaco’s argument is clearly of no avail. The PMPA allows non-renewal of a franchise relationship only if one of several specific criteria is met, and a franchisor’s desire to terminate in accordance with previously announced intentions is not one of the criteria.
 
 [3]
 

 See
 
 15 U.S.C. § 2802(b). Although the Act does not apply to franchise relationships terminated prior to June 19, 1978,
 
 Ted’s Tire Service, Inc. v. Chevron U.S.A., Inc.,
 
 470 F.Supp. 163 (D.Conn.1979), if supplies have actually ceased by that date,
 
 [4]
 
 it does apply to franchise relationships terminated after the effective date of the Act.
 

 Nevertheless, even if Texaco could demonstrate that its continuation of supplies to Wisser after June 19,1978 was due solely to the Mandatory Allocation Controls, the Act would apply. Careful examination of the PMPA’s language and legislative history shows the Wisser-Texaco relationship to be a “franchise relationship” within the meaning of the Act regardless of whether Texaco’s role was voluntary and contractually-based at the time the Act went into effect.
 
 [5]
 

 There is no dispute that Wisser's activities in relation to Texaco have continued largely as they were under the 1969 franchise agreement, and that these activities would constitute a franchise relationship under the PMPA, unless there were some exception for relationships which had become noncontractual and had been perpetuated only by the Mandatory Allocation Controls. Wisser arranges for distribution of Texaco gasoline to a number of service stations, buys Texaco gasoline and resells it to service stations which in turn market it under the Texaco trademark. The PMPA includes jobbers within its definition of franchisee, and in fact includes all parties engaged in the distribution of motor oil except those who are either employees of the supplier or serve only as common carriers. Senate Report,
 
 supra
 
 at 885, 889.
 

 
 *725
 
 Two passages in the Act’s legislative history demonstrate Congress’ intention that supply relationships maintained by the Mandatory Allocation Regulations prior to June 19, 1978, be included within the Act’s provisions pertaining to non-renewal of franchise relationships. 15 U.S.C. § 2802(b)(2)-{3). The first is the treatment of “debranded” firms, which, although assured of a continuous supply of gasoline by the Mandatory Allocation Regulations, had their right to use the franchisor’s trademark withdrawn prior to the PMPA’s enactment:
 

 Since the basic date for allocation controls (May 15, 1973) numerous retailers and distributors have lost the use of refiner trademarks previously granted by their suppliers. These “debranded” firms would be also denied protection of title I even though many have continuously maintained the supply agreements with their suppliers that previously existed under a refiner trademark. The committee expanded the coverage of title I to include these “debranded” firms so as to permit them a measure of supply assurance for the future.
 

 The effect of this change is merely to permit supply agreements which, despite subsequent withdrawal of a trademark, have existed continuously since May 15, 1973, to be treated as franchises for the purpose of title I.
 

 Senate Report,
 
 supra
 
 at 885.
 

 Since the likely motivation behind an oil company’s withdrawal of a dealer’s right to use its trademark is a desire not to renew the supply relationship, it is significant that Congress specifically extended protection of the Act to debranded firms without proposing any inquiry as to the voluntariness of the supply relationship.
 

 Congress was undoubtedly aware of the Mandatory Allocation Regulations when it passed the PMPA, and it must have contemplated that those regulations might someday expire. If Congress had intended to create a specific exception for franchisors whose compliance with the regulations was under protest, it probably would have given some indication of this in the statute or its legislative history, particularly since the statute is worded so inclusively. There is no indication of such an intent in either the statute or the Senate Report,
 
 [6]
 
 and the protection of debranded firms strongly suggest an intention to the contrary.
 

 In addition, the Senate Report explains that one of the two reasons for using the term “franchise relationship” as opposed to “franchise” was specifically to include within the Act’s coverage situations where the underlying contractual agreement had expired, but the parties’ business dealings continued nonetheless.
 
 [7]
 

 In connection with the non-renewal provisions of the title, the term “franchise relationship” is utilized. The term is defined to cover the broad relationship which exists between a franchisor and a franchisee by reason of the franchise agreement. The term is utilized for two reasons. First, in the renewal context, the contract which constitutes the franchise may no longer exist and the term “franchise relationship” is utilized to avoid any contention that because the
 
 *726
 
 “franchise” does not exist there is nothing to renew. The renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement.
 

 Senate Report,
 
 supra
 
 at 888.
 

 The above passage addresses a situation where ongoing business activity continues notwithstanding the absence of any agreement to perpetuate it. Wisser’s situation is different in that the activity has continued supported by short-term agreements, each including a formulaic denial of intention to be bound to a long-term relationship. By including within the Acts’s coverage the first type of situation without any inquiry into the parties’ long-term intentions, the Congress demonstrated a willingness to impose obligations beyond those which had been established contractually.
 
 [8]
 
 Given this willingness, there is no reason to assume the Congress would have treated the second type of situation any differently from the first without at least giving some specific indication to that effect. Rather Congress’ approach appears to have been to restrict termination or non-renewal of an on-going supply relationship irrespective of the parties’ reasons for maintaining the relationship.
 

 The PMPA created specific exceptions to its non-renewal provisions for trial franchises and interim franchises. 15 U.S.C. § 2803. However, neither exception is applicable here. To be considered a “trial franchise” a franchise must have been entered into after June 19,1978, its franchisee must not previously have been a party to a franchise with the franchisor, its initial term must have been for a period of not more than a year, and at the outset it must have included a written statement saying that it was a “trial franchise.”
 
 Id.
 
 An “interim franchise” can exist only when there has been “a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located.” 15 U.S.C. § 2802(b)(2)(E). The fact that Congress would specify and narrowly define these two exceptions suggests that it did not intend additional exceptions based upon a franchisor’s intention at the time the Act went into effect that a longstanding franchise relationship be terminated soon thereafter.
 

 Recent cases have held the PMPA applicable to franchise relationships in spite of the franchisor’s letter of termination issued prior to the Act’s effective date. In
 
 Brach v. Amoco Oil Company,
 
 slip, op., 80 Civ. 4197 (N.D.Ill. October 24, 1980) the court summarized the relevant facts as follows:
 

 In November 1976, Brach and Exxon Company (“Exxon”) entered into a one year lease agreement whereby Exxon leased to Brach certain premises in Win-field, Illinois for the operation of a retail service station. By a succession of assignments not relevant to the present case, Exxon’s interest in the demised premises was conveyed to Amoco in August 1977. Amoco did not renew the lease but agreed to extend the lease for a period of six months subject to the conditions that Brach agree to abide by the hours required for operation provided for in the lease, keep the service station in a neat and attractive manner, and that Brach actively seek another location in which to relocate his business. In May 1978, Amoco sent Brach a letter certified by mail stating that Amoco intended to cancel the tenancy as of June 30, 1978. At the end of June, Amoco sent Brach another letter stating that Amoco would continue to deliver gasoline to Brach as allegedly required by certain United States Department of Energy regula
 
 *727
 
 tions, but that such deliveries would not constitute a waiver of Amoco’s demand for the premises.
 

 Id.
 
 at 2-3.
 

 Notwithstanding Amoco’s previously expressed intention not to renew the lease, the court concluded:
 

 While the lease itself expired prior to the enactment of the PMPA, the month-to-month tenancy [established by Illinois law in such circumstances] was in existence at the time that the PMPA went • into effect on June 19, 1978. Thus, Amoco’s decision in February 1980 not to continue Brach’s lease is governed by section 2802(a)(2) of the PMPA.
 

 Id.
 
 at 7.
 

 Within this Circuit the PMPA has been held applicable to a case based on the same reasoning as employed in
 
 Brach. See Mun-no v. Amoco Oil Company, supra.
 

 Texaco finds support for its position in dicta contained in the recent case of
 
 Trigg v. Texaco Inc.,
 
 511 F.Supp. 477 (S.D.Tex., 1981). There the court allowed Texaco to cut off supplies following the termination of the Mandatory Allocation Regulations and declared that “where a party is compelled to perform, there exists no consensual relationship and there can be no contract.”
 
 Id.
 
 at 450. Although the facts of
 
 Trigg
 
 are superficially similar to those of the case at bar, there is at least one crucial difference: in
 
 Trigg
 
 there had been a consignment agreement between the parties from 1973 until 1979, but the agreement was lawfully terminated based on one of the grounds recognized by the PMPA.
 

 In September, 1979 Texaco sent [plaintiff] a “Notice of Termination and Nonrenewal” which terminated the consignment agreement between the parties. This termination, which became effective on December 13, 1979, was done in accordance with the Petroleum Marketing Practices Act (Act) and is not contested in the present action.
 

 Id.
 
 at 449.
 

 In this case Wisser contends that its original franchise relationship was never lawfully terminated. In
 
 Trigg
 
 the issue was whether “the relationship between [plaintiff] and Texaco between December 13, 1979 and February 20, 1981” created a franchise
 
 de novo. Id.
 
 Here the issue is whether a franchise relationship existed at the time the PMPA went into effect in 1978. The question of whether coerced conduct can create a franchise relationship
 
 de novo
 
 is fundamentally different from the question of whether an existing franchise relationship will be deemed to have terminated because its continuation arguably has been the result of coercion.
 

 Congress may well have intended that a franchise relationship lawfully terminated under the PMPA not require a second lawful termination in accordance with the Act’s provisions merely because executive regulations prevented supplies from being cut off immediately upon the first termination. However, such an intent is not consistent with Congress’ other intention that protection of the Act be accorded to longstanding franchisees whose existing franchise relationships had been perpetuated by executive regulations in years directly preceding the Act.
 

 Accordingly, the Wisser-Texaco relationship constitutes a franchise relationship within the meaning of the PMPA, and the Act’s limitations on the franchisor’s right not to renew the relationship are applicable. Texaco argues in the alternative that it has complied with the requirements of the PMPA by basing its non-renewal of Wisser’s supply on two grounds recognized by the Act. However, with neither of these grounds has Texaco demonstrated a sufficient likelihood of compliance to defeat the motion for preliminary injunction. Once Wisser has demonstrated the existence of a franchise relationship and its impending non-renewal the burden shifts to Texaco to demonstrate that “nonrenewal was permitted under section 2802(b) or 2803 of this title...” 15 U.S.C. § 2805(c).
 

 Section 2802(b)(2)(D) allows non-renewal by mutual consent but imposes certain safeguards to insure that the decision not to renew is indeed voluntary on both sides. The section recognizes the efficacy of
 

 
 *728
 
 An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if—
 

 (i) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of non-renewal, not more than 180 days prior to the conclusion of the term, or the expiration date stated in the franchise;
 

 (ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and
 

 (iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.
 

 15 U.S.C. § 2802(b)(2)(D). Texaco argues that the addendum of January 5, 1981, included an agreement not to renew the franchise after June 30, 1981. The addendum recited that, “it is further understood and agreed that in the event the Federal Energy Office Petroleum Regulations are rescinded or discontinued, ... by June 30, 1981 there will be no further supply of Texaco products.” Wisser argues that this provision cannot be considered an outright agreement not to renew because it was predicated on a contingent future event.
 

 Even if the agreement had been unconditional, its validity under the PMPA would be doubtful. By renewing the franchise relationship for only 176 days instead of the usual six months Texaco managed to evade the letter of the first restriction, namely that the agreement be made within 180 days of the proposed nonrenewal. However, the agreement not to seek further renewals was imposed as a condition of the current renewal. This appears to be the type of “agreement” which Congress sought to exclude with its 180-day provision:
 

 The purpose of the 180-day limitation is to preclude a franchisor from requiring the franchisee to sign a mutual termination or nonrenewal agreement at the inception of the franchise. A contrary re-suit would permit a franchisor to frustrate the purposes of [the franchise protection provisions].
 

 Senate report,
 
 supra
 
 at 892. Moreover, even assuming the nonrenewal agreement’s validity under the PMPA, there is still the obstacle that Wisser properly exercised its option to repudiate the agreement. As of January 5, 1981, the agreement was contingent and hypothetical. The time at which Wisser became obligated to inform Texaco of its repudiation was after the condition had occurred and after Texaco had provided written notice that it intended not to renew in accordance with the agreement. Texaco provided such notice by letter on February ■18,1981. Wisser rejected Texaco’s notice of nonrenewal by letter dated February 19, 1981, well within the seven-day time limit.
 

 Texaco’s second ground for termination under the PMPA was raised belatedly. Wisser was sent a second notice of termination listing as the basis “willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee,” 15 U.S.C. §§ 2802(b)(2)(C), 2802(e)(10), on May 29, 1981, approximately two weeks after a hearing was scheduled on the first notice of termination and five days before that hearing was held. At the hearing the court indicated that the second ground could not be adequately assessed without sufficient preparation for an evidentiary hearing. It was agreed that the issues raised by the first notice of termination should be considered first.
 

 Specific evidence supporting Texaco’s charges of “willful adulteration” has not yet been presented. Wisser has cast some doubt upon the validity of this ground by arguing that it does not control the service stations where the adulteration is alleged to have occurred, hence such adulteration could not have been wilful on its part. Wisser also argues that it is unlikely that the second notice of termination will have complied with the notice provisions of § 2804 of the Act which generally require 90-days advance notice to affected parties.
 
 [9]
 

 
 *729
 
 Without attempting to forecast the outcome of these issues, the court is able to conclude that plaintiff clearly has demonstrated the existence of “sufficiently serious questions going to the merits to make such questions a fair ground for litigation.” 15 U.S.C. § 2805(b)(2). The standard for granting preliminary injunctive relief under the PMPA is a more liberal version of the alternative general equity standard of the Second Circuit,
 
 see Sonesta International Hotels Corp. v. Wellington Associates,
 
 483 F.2d 247 (2d Cir. 1973), hence the granting of an injunction turns primarily on a balancing of hardships.
 
 [10]
 
 In this case it is clear that the balance of hardships favors Wisser over Texaco. Since Texaco is Wisser’s principal supplier and it would at least be difficult for Wisser to find an alternative source, the threatened cutoff poses a risk of undermining the supply agreements and lease agreements between Wisser and its dealers. No doubt this would pose a grave risk to Wisser’s economic livelihood and future prospects. By contrast, Texaco can only assert that the granting of preliminary injunctive relief would cause it to continue giving a three and three-quarter cent per gallon discount on gasoline which it would not otherwise have to give. Accordingly, plaintiff is entitled to preliminary injunctive relief.
 

 Texaco is hereby enjoined from cutting off supplies of oil and related products to the Wisser Company for any and all reasons, and is further directed to continue providing such supplies at their current and habitual levels in accordance with the PMPA pending the outcome of a hearing on the question of whether Texaco may lawfully refuse to renew the Wisser-Texaco franchise relationship.
 

 IT IS SO ORDERED.
 

 [1]
 

 . The agreement was entered into on June 25, 1969. On February 5, 1972, Texaco informed Wisser that it planned to terminate the agreement effective May 5, 1972. On May 5, Texaco and Wisser entered into a letter agreement which said that the prior agreement had been lawfully terminated effective May 31, 1972.
 

 [2]
 

 . In this regard the Senate Report contains the following passage.
 

 The prospect of [nonrenewal] is ever present and the franchisee can readily comprehend the implications of departing from the marketing policies of the franchisor, even if in some cases those policies are contrary to the franchisee’s economic interests.
 
 This problem is made more severe as shorter franchise periods and more frequent renewal intervals
 
 are
 
 utilized by the franchisor.
 
 The prospect of non-renewal for arbitrary or discriminatory grounds threatens the independence of the franchisee as a competitive influence in the marketplace.
 

 S.Rep. No. 95-731, 95th Cong.2d Sess. 41,
 
 Reprinted in
 
 [1978] U.S.Code Cong.
 
 &
 
 Ad.News, pp. 873, 887 (emphasis added) (hereinafter cited as “Senate Report”).
 

 [3]
 

 . The specific criteria include
 

 (A) A failure by the franchisee to comply with any provisions of the franchise, which provision is both reasonable and of material significance to the franchise relationship,
 

 (B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise,
 

 (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable,
 

 (D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship,
 

 (E) . . . a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor -fuel through retail outlets in the relevant geographic market area in which the marketing premises are located,
 

 [4]
 

 . A statement of an intention to terminate at some future date constitutes a termination only as of the date supplies are actually cut off.
 
 Munno v. Amoco Oil Co., supra,
 
 488 F.Supp. at 1116 n.l;
 
 Walters v. Chevron U.S.A., Inc.,
 
 476 F.Supp. 353, 354-55 (N.D.Ga.1979),
 
 aff'd,
 
 615 F.2d 1135 (5th Cir. 1980).
 

 [5]
 

 . It goes without saying that where a statute is to be construed, the object of the court is to ascertain the congressional intent and to give effect to the legislative will.
 
 Chapman v. Houston Welfare Rights Org.,
 
 441 U.S. 600, 607-08, 99 S.Ct. 1905, 1910-11, 60 L.Ed.2d 508 (1979);
 
 Philbrook v. Glodgett,
 
 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). This is best done by considering the terms of the statute in light of the mischief the statute was intended to remedy.
 
 Liberation News Service v. Eastland,
 
 426 F.2d 1379, 1383 (2d Cir. 1970);
 
 Munno v. Amoco Oil Company, supra,
 
 488 F.Supp. at 1118.
 

 [6]
 

 . One place in the statute where one would have expected to find some reference to the Mandatory Allocation Regulations is in the section detailing events relevant to the franchise relationship and as a result of which termination or nonrenewal is reasonable. 15 U.S.C. § 2802(c). This section lists twelve different types of events but makes no mention of change in federal regulation governing allocation.
 

 [7]
 

 . Similarly, in assessing the extent of a franchisee’s supply protection the PMPA looks at actual volume habitually purchased or delivered. According to the Senate Report:
 

 The committee adopted another change to ensure, unless a compelling reason to the contrary is shown, that supply protection under title I would be based on actual volumes supplied under the established pattern of business rather than on gallonages specified in contracts that never reflected or no longer reflect the supply practices of the parties to the contract.
 

 Senate Report,
 
 supra
 
 at 885. For discussion of how past levels function to establish a rebut-table presumption
 
 see id.
 
 886, 889.
 

 [8]
 

 . It has been noted that the PMPA conceives of franchises primarily as fiduciary relationships where the specific obligations of parties transcend those which are created contractually. See Comment,
 
 Retail Gasoline Franchise Terminations and Nonrenewals under Title I of the Petroleum Marketing Practices Act,
 
 80 Duke Law Journal 522 (1980);
 
 also see Amott v. American Oil Co.,
 
 609 F.2d 873, 877 (8th Cir. 1979),
 
 cert. denied,
 
 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).
 

 [9]
 

 . Section 2804(b)(1) creates an exception for “circumstances in which it would not be rea
 
 *729
 
 sonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect” provided notification is furnished on the earliest date reasonably practicable.
 

 [10]
 

 . In order to be entitled to a preliminary injunction under the PMPA a plaintiff must demonstrate that:
 

 the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and [that]
 

 there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation, and
 

 the court must determine that:
 

 on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.
 

 15 U.S.C. § 2805(b)(2)
 

 The standard does not require plaintiff to demonstrate either irreparable injury or strong likelihood of success on the merits. It thus establishes a relatively liberal approach to the question of preliminary injunctive relief.
 
 Gilderhus v. Amoco Oil Company,
 
 470 F.Supp. 1302, 1304 (D.Minn. 1979);
 
 also see Saad v. Shell Oil Co.,
 
 460 F.Supp. 114 (E.D.Mich.1978); Senate Report,
 
 supra
 
 at 873, 899.