

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-2008

# Kehm Oil Co v. Texaco Inc

Precedential or Non-Precedential: Precedential

Docket No. 07-1650

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Kehm Oil Co v. Texaco Inc" (2008). *2008 Decisions.* Paper 741.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/741

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-1650

———

KEHM OIL COMPANY; GOLDEN OIL COMPANY,

Appellants

v.

TEXACO, INC.; TEXACO REFINING AND MARKETING
(EAST), INC., D/B/A STAR ENTERPRISE-PARTNERSHIP;
CHEVRON CORPORATION; MOTIVA ENTERPRISES,
LLC; SFM ENERGY, LLC; CHEVRON PRODUCTS
COMPANY; CHEVRON U.S.A. INC; CHEVRONTEXACO
CORPORATION; STAR ENTERPRISE PARTNERSHIP,

Appellees

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 06-cv-785)
District Judge: Honorable Terrence F. McVerry

———

Argued March 13, 2008

Before: FUENTES, CHAGARES, and VAN ANTWERPEN,
<u>Circuit Judges</u>.

(Filed: July 31, 2008)

1

Thomas J. Farnan (Argued)
Robb, Leonard & Mulvihill
One Mellon Bank Center, Suite 2300
Pittsburgh, PA 15219

      Attorneys for Appellants

Samuel E. Stubbs (Argued)
David M. Goldberg
Matthew E. Coveler, Esq.
Jennifer B. Hogan, Esq.
Pillsbury, Winthrop, Shaw & Pittman
Two Houston Center
909 Fannin, 22nd Floor
Houston, TX 77010

Eric L. Horne
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th floor
Pittsburgh, PA 15219

      Attorneys for Appellees

————

OPINION OF THE COURT

————

FUENTES, Circuit Judge.

Kehm Oil and Golden Oil (collectively, "Kehm"), owned by George Kehm, were dealers of Texaco-branded gasoline in Western Pennsylvania for 44 years, owning 28 Texaco gas stations by the end of the relationship. Over that period of time, Kehm entered into franchise agreements with various distinct Texaco-owned entities, including Motiva Enterprises, LLC ("Motiva"). Motiva, which was at that time part-owned by Texaco, informed Kehm in 2002 that as of June 2006, it could no longer license the

2

Texaco brand to Kehm and would terminate Kehm's franchise. When Motiva terminated Kehm's franchise in 2006, Kehm filed this action under the Petroleum Marketing Practices Act ("PMPA"), claiming that it had an unbroken "franchise relationship" with Texaco that was not properly cancelled under the PMPA.

In this opinion, we address whether Kehm was in a franchise relationship with Texaco, Inc. ("Texaco") at the time of termination, requiring Texaco to fulfill the requirements of the PMPA before terminating its relationship with Kehm. We conclude that Motiva, not Texaco, had a franchise relationship with Kehm at the time of termination and therefore Texaco did not, and could not, violate the PMPA.

I.

Following a number of franchise agreements that Kehm signed with various Texaco-owned entities over time, in 1998, Kehm entered into a five-year agreement with Star Enterprises ("Star")[1] (the "Final Contract"). Less than a year after the contract was signed, Star sent Kehm a letter indicating that the contract would be assigned to Motiva, a joint venture between Texaco, Shell Oil Company ("Shell"), and SRI. In October 2001, Texaco and Chevron Corporation ("Chevron") merged.[2] As a condition of approval for the merger, the Federal Trade Commission ("FTC") required Texaco to divest its interest in Motiva and, if certain conditions were met, to offer to extend Motiva's ability to license Texaco-branded oil until June 30, 2006. Chevron Corp. and Texaco Inc., F.T.C. Docket No. C-4023, Jan. 2, 2002. Accordingly, Texaco transferred its interest in Motiva to Shell and SRI and agreed to license its brand to Motiva through June 30,

_____

[1] Star was a joint venture between Saudi Refining, Inc. ("SRI") and Texaco.

[2] Chevron Corporation changed its name to ChevronTexaco Corporation after the merger but then changed it back to Chevron Corporation in 2005. Kehm Oil Co. v. Texaco, Inc., No. 2:06-cv-785, 2007 WL 626140, at *2 (W.D. Pa. Feb. 26, 2007).

3

2006.

In light of the impending loss of its ability to license Texaco products, Motiva sent a letter to Kehm in February 2002, stating that as of June 30, 2006, it would no longer have a license in the Texaco brand. Motiva also indicated that, in its new role as a Shell affiliate, it would consider whether to offer Kehm a Shell-branded franchise when the Texaco licensing agreement expired. In that letter, Motiva stated that "[a]s Motiva is losing its right to grant you the right to use the Texaco trademark, Motiva must formally end our Texaco brand franchise in accordance with the Petroleum Marketing Practices Act . . . effective June 30, 2006." (A. 642.)

Kehm claims that it did not consider Motiva's notice to terminate the franchise as an official termination from Texaco because a "Texaco" representative had stated that the relationship would continue beyond June 30, 2006. Specifically, an employee of Chevron Products Company, James Barnes, performed a site visit in March or April of 2006 allegedly to negotiate an agreement to continue the franchise relationship between Texaco and Kehm. Kehm also claims that in order to continue the relationship with Texaco it agreed to debrand six stations, invest $500,000 in improving the remaining 22 stations, and offer two of the stations for sale to fund the improvements. Kehm contends that it only learned that Texaco would not continue the franchise after June 30, 2006, at some point between April and June of that year. Kehm and Motiva continued to act under the terms of the Final Contract until the termination of the franchise on June 30, 2006.

Kehm brought suit against Texaco, Texaco Refining and Marketing (East), Inc. ("TRMI"), Motiva, SFM Energy LLC, Chevron, Chevron USA Inc., Chevron Products Company, and Star in federal district court under the PMPA, seeking a TRO, a preliminary injunction, and damages under the PMPA and state law on June 14, 2006.[3] The District Court denied the emergency relief,

_____

[3] The District Court granted Motiva and SFM's motion to dismiss on November 9, 2006. Kehm did not appeal that decision.

4

holding that Kehm only had a franchise relationship with Motiva and that Motiva had the right to terminate the relationship under the PMPA because Motiva lost the right to use the Texaco trademark.

Subsequently, Texaco, Chevron, TRMI, and Star filed motions for summary judgment, and Chevron also filed a motion to dismiss for lack of personal jurisdiction. The District Court granted Chevron's motion to dismiss for lack of personal jurisdiction and granted the other defendants' summary judgment motions, finding that Kehm failed to sue within the PMPA's one year statute of limitations period. Kehm Oil Co. v. Texaco, Inc., No. 2:06-cv-785, 2007 WL 626140, at *3, *5 (W.D. Pa. Feb. 26, 2007). In the alternative, the District Court found that when its franchise was terminated, Kehm did not have a franchise relationship with Texaco, and Motiva, who Kehm did have a franchise relationship with, properly terminated the franchise under the PMPA. Id. at *6. Kehm appeals.

II.

The District Court had subject matter jurisdiction over the PMPA claim pursuant to 15 U.S.C. § 2805(a) and 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction over the District Court's final decision pursuant to 28 U.S.C. § 1291. We exercise plenary review over the grant of Chevron's motion to dismiss for lack of personal jurisdiction and the grant of the remaining defendants' summary judgment motions. Marten v. Godwin, 499 F.3d 290, 295 n.2 (3d Cir. 2007); Bus. Edge Group, Inc. v. Champion Mortgage Co., 519 F.3d 150, 153 n.5 (3d Cir. 2008). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing the District Court's grant of the motion to dismiss and the motions for summary judgment, we view the facts in the light most favorable to the nonmoving party. Marten, 499 F.3d at 295 n.2; Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 260 (3d Cir. 2007).

III.

5

The aim of the PMPA is to "protect[ motor fuel station] franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S. Rep. No. 95-731, at 15 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 873, 874 (hereinafter "Senate Report"). According to the legislative history of the PMPA, Congress found that franchisors have more bargaining power than franchisees because franchisees depend on franchisors to supply their main product, motor fuel, and franchisors often control the premises upon which the franchisees operate. O'Shea v. Amoco Oil Co., 886 F.2d 584, 587 (3d Cir. 1989). Because of the imbalance in bargaining power, franchisors, prior to the enactment of the PMPA, were able to enter into contracts granting them great flexibility in their ability to terminate. Senate Report at 17-18, 1978 U.S.C.C.A.N. at 876. Therefore, it was determined that there was a need to protect motor fuel franchisees because "terminations and non-renewals, or threats of termination or non-renewal, [were being] used by franchisors to compel franchisees to comply with marketing policies of the franchisor." Id. at 17, 1978 U.S.C.C.A.N. at 876.

Congress's purpose in enacting the PMPA was to "protect a franchisee's 'reasonable expectation' of continuing the franchise relationship while at the same time insuring that distributors have 'adequate flexibility . . . to respond to changing market conditions and consumer preferences.'" Slatky v. Amoco Oil Co., 830 F.2d 476, 478 (3d Cir. 1987) (quoting Senate Report at 19, 1978 U.S.C.C.A.N. at 877). In order to achieve these goals, the PMPA restricts the grounds on which a franchisor can terminate or fail to renew a franchise.[4] 15 U.S.C. § 2802. The PMPA also imposes

---

[4] The PMPA provides a number of valid reasons for a franchisor to terminate or fail to renew a franchise, including mutual agreement, the failure of the franchisee to comply with material provisions of the franchise agreement, the franchisee's declaration of bankruptcy, and others. 15 U.S.C § 2802(b)(2), (c). There are additional valid reasons to fail to renew a franchisee, such as the franchisee's failure to operate the premises in a clean, safe, and healthful manner. 15 U.S.C. § 2802(b)(3).

6

notice requirements on franchisors looking to terminate or nonrenew the franchise relationship. 15 U.S.C. §§ 2804. Congress also included a statute of limitations for PMPA actions. The PMPA provides that "no . . . action may be maintained [under the PMPA] unless commenced within 1 year . . . of . . . the date of termination of the franchise or nonrenewal of the franchise relationship." 15 U.S.C. § 2805(a)(1).

A review of the agreements Kehm signed with the defendants makes clear that Kehm's claims are time-barred. The most recent agreement between Kehm and Texaco expired, by its terms, on December 13, 1987. The agreement with TRMI expired, by its terms, on June 30, 1990. The Final Contract with Star was set to expire on June 30, 2003 but was assigned to Motiva in 1999. In the assignment letter, Star indicated to Kehm that "Motiva shall be substituted for Star with respect to the rights and obligations of Star under these agreements." (A. 309.) Finally, Kehm never had a contractual relationship with Chevron, ChevronTexaco Corporation, Chevron Products Company, or Chevron U.S.A., Inc.[5]

Accordingly, Kehm's claims against the defendants are untimely because they were not "commenced within 1 year . . . of . . . the date of termination of the franchise or nonrenewal of the franchise relationship." 15 U.S.C. § 2805(a)(1). Kehm did not file its lawsuit until June 14, 2006. The defendant with the most recent contract with Kehm, Star, properly assigned the Final Contract to Motiva in May 1999, over seven years before Kehm filed its lawsuit.

---

[5] Kehm complains that a representative from Chevron Products Company, James Barnes, spoke to him in April 2006 and led him to believe that the franchise relationship with Texaco would continue. Whatever representations Barnes made to Kehm could not have given rise to an obligation under the PMPA because Kehm was not in a contract with Chevron Products Company in April of 2006. A franchise under the PMPA requires a "direct contractual relationship." Hutchens v. Eli Roberts Oil Co., 838 F.2d 1138, 1144 (11th Cir. 1988).

IV.

A.

Kehm argues that its "franchise relationship" with Texaco did not end until June 30, 2006, so that its claim is timely filed.[6] Kehm contends that, regardless of the specific entity that it contracted with, its franchise relationship with Texaco endured throughout the time Kehm sold Texaco-branded oil at its stations. Kehm asserts that Texaco violated the PMPA when it did not offer to renew Kehm's franchise after Motiva was no longer able to provide it with Texaco-branded oil.

In order to have a timely claim against Texaco, we would need to find that Texaco and Kehm remained in a franchise relationship at least through June 15, 2005, one year prior to the date that Kehm filed its lawsuit. For the reasons that follow, we conclude that Kehm's franchise relationship with Texaco ended in 1987.

The term "franchise relationship" is defined under the PMPA as "the respective . . . obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." 15 U.S.C. § 2801(2). The PMPA defines a franchise, in relevant part, as "any contract . . . between a distributor and a retailer." 15 U.S.C. § 2801(1)(A)(iv). Kehm is indisputably not in a franchise with any of the defendants but argues that franchise relationship, as used in the PMPA, is broad enough to encompass its current relationship with Texaco.

The legislative history of the PMPA explains why, given that a franchise gives rise to a franchise relationship, the term

---

[6] Presumably, this argument only applies to Kehm's claim against Texaco itself. Kehm lumps all of the Texaco entities together, suing Texaco and then stating that Texaco is "doing business as" the rest of the defendants, without providing any basis for doing so. See Second Am. Compl., Count I.

"franchise relationship," rather than simply "franchise" is used in connection in the nonrenewal provisions of the PMPA. According to the Senate Report, a "franchise relationship" covers:

> the broad relationship which exists between a franchisor and a franchisee by reason of the franchise agreement. The term is utilized for two reasons. First, in the renewal context, the contract which constitutes the franchise may no longer exist and the term 'franchise relationship' is utilized to avoid any contention that because the 'franchise' does not exist there is nothing to renew. The renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement. Second, because the title contemplates changes in the specific provisions of the franchise agreement at the time of renewal, the title requires renewal of the relationship between the parties as distinguished from a continuation or extension of the specific provisions of the franchise agreement. Use of the narrower term 'franchise' in this context could raise unintended questions regarding the ability of the franchisor to comply with the renewal obligations of the title by offering a[n] . . . agreement which differs in any particular from the expiring franchise.

Senate Report at 30, 1978 U.S.C.C.A.N. at 888; see also H. Rep. No. 95-161, at 20 (1977). Thus, the Senate contemplated two very specific scenarios, neither implicated here, when it decided to use the language "franchise relationship" rather than simply the word "franchise" with respect to prohibitions on nonrenewal. "Franchise relationship" was used to require a franchisor to renew with the franchisee, except if certain conditions were satisfied, even if the contract that the parties were operating under had expired. The use of the phrase "franchise relationship" also allows the franchisor to alter the terms of the franchise agreement between franchise contracts. In this case, the contract between Kehm and Texaco has not simply expired. The last contract with Texaco ended eighteen

9

and a half years and two contracts ago. The Senate Report does not support Kehm's view that it was in a franchise relationship with Texaco through June 30, 2006.

B.

Our view that Kehm was not in a franchise relationship with Texaco in 2006 is further supported by the relevant case law. See Hutchens v. Eli Roberts Oil Co., 838 F.2d 1138 (11th Cir. 1988); Consumers Petroleum Co. v. Texaco, Inc., 804 F.2d 907 (6th Cir. 1986). In Hutchens, American Petrofina Marketing ("Fina") owned the service station operated by the plaintiff, Hutchens. 838 F.2d at 1140. Fina leased the property to Roberts Oil, which in turn subleased the property to Hutchens. Id. Hutchens brought a lawsuit under the PMPA when Fina terminated the underlying lease between Fina and Roberts Oil. Id. The Eleventh Circuit found that Hutchens did not have a claim against Fina because under the PMPA, a franchise requires a "direct contractual relationship." Id. at 1144.

In Consumers, Consumers Petroleum Company ("Consumers") filed a lawsuit against Texaco alleging that it violated the PMPA by misleading Consumers into believing that it was planning to remain in Michigan, the geographic market in which Consumers operated. 804 F.2d at 910. Consumers had entered into a number of franchise contracts with Texaco and in 1976 entered into one such contract for a five-year term. Id. at 909. In 1977, a rumor circulated that Texaco planned to withdraw from Michigan. Id. Subsequently, Consumers was approached by a competitor of Texaco's, with an offer to become a franchisee. Id. Texaco told Consumers that it would not withdraw from the market and Consumers declined the offer from the competitor. Id. Two years later, Texaco announced its decision to withdraw from Michigan. Id. Texaco provided notice that it would not renew the contract after it expired and the parties entered into a one-year interim agreement, which was designed to ease the transition prior to Texaco's withdrawal from the market. Id. at 909-10.

After the interim agreement expired, Consumers sued, alleging that Texaco misled it into believing that Texaco was not

10

planning to withdraw from Michigan during the pendency of the five year contract. Id. at 910. Texaco moved for summary judgment, claiming that the lawsuit was untimely under the PMPA's statute of limitations, as it was filed more than a year after the nonrenewal of the five-year agreement, even though it was filed within a year of the termination of the interim agreement. Id.

In order to resolve whether the case was time-barred, the Sixth Circuit considered the meaning of "franchise relationship" in the context of the PMPA. Id. at 910-12. The court found that a "franchise relationship is nothing more than the distribution obligations and responsibilities resulting from a particular franchise" and the franchise and interim franchise "form[ed] . . . separate franchise relationship[s]." Id. at 911. Accordingly, the Sixth Circuit found that Consumers was obliged to sue within one year of the termination of the five-year agreement, because Consumers alleged a violation of that agreement. Id. at 912.

In this case, Kehm has not had a direct contractual relationship with Texaco for almost two decades. Kehm is a sophisticated business entity that presumably understood that it was dealing with distinct corporate entities. Under Hutchens, Kehm cannot assert the existence of a franchise relationship without the existence of a direct contractual relationship. Furthermore, under Consumers, an entity needs to sue within a year of the termination that it claims violated the PMPA. In 2006, Kehm had a single franchise relationship with Motiva and Kehm has abandoned any argument that Motiva violated the PMPA. We hold that Kehm cannot reach back to a contract which expired in 1987 to claim a current franchise relationship with Texaco.

Kehm relies on two cases to support its view that it was in a franchise relationship with Texaco in 2006. See Barnes v. Gulf Oil Corp., 795 F.2d 358 (4th Cir. 1986); Wisser Co. v. Texaco, Inc., 529 F.Supp. 727 (S.D.N.Y. 1981). In Barnes, the plaintiff entered into a series of franchise agreements with Gulf Oil Corporation ("Gulf") between 1979 and 1985. 795 F.2d at 359-60. Barnes asserted that Gulf terminated the franchise relationship in violation of the PMPA by assigning its interest in the franchise to an unrelated entity, Anderson Oil. Id. at 360. Barnes alleged that

11

by assigning the contract, the cost of gasoline went up over $1,000 a month, because Anderson marked up Gulf's oil. Id. at 361. The Fourth Circuit found that even if an assignment is legal under state law, it is not permissible under the PMPA if "the franchisee can no longer obtain gasoline at the stipulated franchise price." Id. at 362. The court held that "[a] franchisor cannot circumvent the protections [of the PMPA] by the simple expedient of assigning the frachisor's obligation to an assignee who increases the frachisee's burden." Id.

Barnes can be distinguished from the instant case. Kehm was not negatively affected when Star assigned the Final Contract to Motiva in 1999.[7] It was not until 2002, when Motiva wrote a letter to Kehm indicating that in 2006 it would no longer have the right to license Texaco Oil, that it became clear that the assignment would have any affect on Kehm. Thus, there is no indication that Star used the "simple expedient" of assignment to avoid the strictures of the PMPA. Kehm concedes this point, admitting that Motiva "did not become exclusively affiliated with Shell and lose its connection to Texaco until after the assignment." (Reply Br. at 4.)

In Wisser, another case relied on by Kehm, Wisser sued Texaco under the PMPA to try to prevent Texaco from halting its supply of Texaco-branded oil. 529 F.Supp. at 728. Wisser and Texaco first entered into an agreement in June of 1969 for a period of three years. Id. Towards the end of that period, Texaco told Wisser that it intended to terminate the relationship at the end of the contract. Id. Despite this representation, the parties entered into a series of six-month contracts extending the franchise relationship, between 1972 and 1981. Id. Texaco argued that subsequent to 1972, every agreement entered into was intended to be temporary and did not reinstate the franchise relationship. Id. at 729. The Wisser court found that Texaco could not evade the

---

[7] In its brief, Kehm overlooks the fact that it was Star, not Texaco, which assigned the contract to Motiva. Whether this claim is properly asserted against Texaco or Star is irrelevant, since it fails against either defendant.

12

creation of a franchise relationship by breaking it into short duration contracts. Id. at 732. This case does not support Kehm's argument that it was in a franchise relationship with Texaco in 2006 as Wisser had contracted with Texaco throughout the entire period. There is nothing in Wisser to suggest that a franchise relationship endures even after a franchisee contracts with a new corporate entity. Accordingly, the District Court properly found Kehm's PMPA claim to be time-barred.

V.

Kehm brought several state common law causes of action against the defendants, including breach of contract, promissory estoppel, civil conspiracy, and interference with contract and prospective contract. The District Court could have, in its discretion, chosen to dismiss the state law claims pursuant to 28 U.S.C. § 1367(c)(3), after dismissing Kehm's PMPA claim. Instead, the District Court found that Kehm's state law claims were all preempted by the PMPA. Thus, we address whether the state causes of action were, in fact, preempted by the PMPA. For the reasons discussed below, we will remand this issue to the District Court for further proceedings consistent with this opinion.

The doctrine of preemption is rooted in the Constitution, which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. This clause has been interpreted to "invalidate state laws that 'interfere with, or are contrary to,' federal law." Colacicco v. Apotex Inc., 521 F.3d 253, 261 (3d Cir. 2008) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). The Supreme Court has identified three types of preemption: 1) express preemption, which is achieved when Congress "so stat[es] in express terms" its intention to preempt state law, 2) field preemption, which is achieved when Congress legislates in a particular area in a "sufficiently comprehensive [way] to make reasonable the inference that Congress 'left no room' for supplementary state regulation," and 3) conflict preemption, which is achieved when a state law actually conflicts with a federal law, even where Congress has not preempted all state law in that area. Hillsborough County

13

v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

> Here, the PMPA expressly preempts certain state laws: [N]o State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a)(1).

We considered 15 U.S.C. § 2806(a)(1) in O'Shea and concluded that "the PMPA preempts only those state laws that regulate the 'grounds for, procedures for, and notification requirements with respect to termination,' to the extent that such laws are not the same as the PMPA." 886 F.2d at 592 (quoting Bellmore v. Mobil Oil Corp., 783 F.2d 300, 304 (2d Cir. 1986)).[8] Accordingly, we stated that the "PMPA only preempts state laws that limit the permissible substantive reasons that a petroleum franchisor can terminate a franchisee" because "[t]he goal of the framers of the PMPA was to create a uniform system of franchise termination, not a uniform system of contract law." Id. at 592-93.

---

[8] Note that this discussion arises in the context of our determining whether O'Shea should have brought his state law claim in an earlier state law suit. O'Shea argued that he could not have because it would have been preempted by the PMPA. We concluded that because his claim was not preempted by the PMPA, he should have brought it in that earlier suit and was barred from bringing the claim with his PMPA claim in federal court by New Jersey's entire controversy doctrine. O'Shea v. Amoco Oil Co., 886 F.2d 584, 589-93 (3d Cir. 1989).

14

We concluded that the plaintiff's state law "contract claims . . . in no way involved procedures for or notification requirements with respect to termination," and thus were not preempted by the PMPA. Id. at 592 (quotation marks omitted).

Subsequently, the Eleventh Circuit, in Shukla v. BP Exploration & Oil, Inc., 115 F.3d 849 (11th Cir. 1997), considered what claims are preempted by the PMPA. Shukla held that "[t]he PMPA provides exclusive remedies for disputes relating to the nonrenewal of franchises and preempts state law claims based on nonrenewal, no matter how such claims are characterized." Id. at 856. Shukla agreed with the outcome in O'Shea because O'Shea "was challenging the enforcement of a provision in the franchise agreement, not the termination or nonrenewal of that agreement." Id. In contrast, if the "state law . . . claims . . . are intimately intertwined with the termination or nonrenewal of a franchise," the PMPA preempts those claims. Id. at 857. We agree with the reasoning of the Eleventh Circuit and adopt the "intimately intertwined" test to determine whether a state law claim is preempted by the PMPA.

In short, when state law claims are "intimately intertwined" with the termination or nonrenewal of a franchise they are preempted by the PMPA. See Clark v. BP Oil Co., 137 F.3d 386, 396 (6th Cir. 1998) (holding that the plaintiff's state law claims were preempted by PMPA because they sought to impose standards more stringent than the PMPA regarding the termination or nonrenewal of his franchise); Simmons v. Mobil Oil Corp., 29 F.3d 505, 512 (9th Cir. 1994) (holding state law claim, premised on implied duty of good faith, was preempted by the PMPA because it concerned the termination of a petroleum franchise); Consumers, 804 F.2d at 915-16 (holding that although a claim for "misrepresentation or fraud does not appear to relate to the nonrenewal or notice requirements" of the PMPA, the state law claim asserted in that case was preempted by the PMPA because it sought to impose a different notice requirement upon Texaco than that required under the PMPA.)

In this case, Kehm's breach of contract, promissory estoppel, civil conspiracy, and interference with contract and

15

prospective contract claims may be so intimately intertwined with the termination or nonrenewal of its franchise that they are preempted by the PMPA. We therefore remand these claims for further proceedings. On remand, the District Court should decide whether to exercise supplemental jurisdiction over Kehm's state law claims. See 28 U.S.C. § 1367(c)(3). If the District Court decides to address the state law claims, it must decide whether Kehm's state law claims are so intimately intertwined with the nonrenewal of his franchise relationship with Texaco that they are preempted by PMPA. If so, the District Court should dismiss those claims.

VI.

Finally, we turn to the issue of whether the District Court has personal jurisdiction over Chevron, in the event that it elects to exercise supplemental jurisdiction over the state law claims against Chevron and finds that they are not preempted. For the reasons discussed below, we will affirm the District Court's grant of Chevron's motion to dismiss based on lack of personal jurisdiction.

The District Court has jurisdiction over Chevron to the extent provided under Pennsylvania state law. Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004). Pennsylvania's long arm statute authorizes personal jurisdiction over entities to the fullest extent permitted under the United States Constitution. 42 Pa. C. S. A. § 5322(b). The Due Process Clause of the Fourteenth Amendment requires that nonresident defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation marks and citations omitted). Having minimum contacts with another state provides "fair warning" to a defendant that he or she may be subject to suit in that state. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quotation marks and citations omitted).

Federal courts have recognized two types of personal jurisdiction which comport with these due process principles:

16

general and specific jurisdiction. General jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 & n.9 (1984). Specific jurisdiction exists when the claim arises from or relates to conduct purposely directed at the forum state. See id. at 414-15 & n.8.

Kehm relies on the following contacts that Chevron had with Pennsylvania to justify personal jurisdiction: 1) all of Texaco's contacts with Pennsylvania, because of the merger, 2) a website, www.chevron.com, in which Chevron purports to be a worldwide service provider, 3) the actions of James Barnes, an employee of Chevron Products Company, and 4) a cease and desist letter sent from Chevron corporation to Kehm after June 30, 2006.[9]

The District Court properly determined that it could not exercise general jurisdiction over Chevron. First, a review of Chevron's website, which Kehm directed the District Court to consider, does not reveal any "systematic and continuous contacts with" Pennsylvania. The merger between Chevron and Texaco was accomplished in such a way that Chevron is now the parent of Texaco, which is indisputably subject to general jurisdiction in Pennsylvania. To obtain general jurisdiction over Chevron in Pennsylvania based on Texaco's contacts, Kehm would need to show that Chevron controls Texaco. See Steinbuch v. Cutler, 518 F.3d 580, 589 (8th Cir. 2008). Kehm failed to do so, presenting no evidence that Chevron controls Texaco. The District Court thus credited Chevron's unrebutted evidence that Chevron's subsidiaries operate independently from Chevron.

Next, we consider whether the District Court can exercise specific jurisdiction over Chevron based on Chevron's conduct directed at Pennsylvania in connection to this lawsuit. Determining

---

[9] Kehm cites to additional facts which do not support its argument, such as the fact that Chevron has owned property in Pennsylvania in the past, though it owns none at present, and has defended lawsuits in Pennsylvania in the past.

17

whether specific jurisdiction exists involves a three-part inquiry. O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007). First, the defendant must have "purposefully directed his activities" at the forum. Burger King, 471 U.S. at 472 (quotation marks and citation omitted). Second, the plaintiff's claim must "arise out of or relate to" at least one of those specific activities. Helicopteros, 466 U.S. at 414. Third, courts may consider additional factors to ensure that the assertion of jurisdiction otherwise "comport[s] with fair play and substantial justice." Burger King, 471 U.S. at 476 (quotation marks and citation omitted).

Reviewing the facts that Kehm provided, we conclude that the District Court also cannot exercise specific jurisdiction over Chevron. Since James Barnes is an employee of Chevron Products Company, not Chevron, and because Kehm provides no reason to ignore the corporate separateness of these two entities, Barnes's acts cannot be attributed to Chevron. See Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 905 (1st Cir. 1980) ("The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary.") (citation omitted). Moreover, the fact that Chevron sent Kehm a cease and desist letter does not rise to the level of purposeful availment for purposes of jurisdiction in Pennsylvania, since the letter expresses the goal not to do business in Pennsylvania. See Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1361 (Fed. Cir. 1998) (holding that a "patentee [does] not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement," as "[g]rounding personal jurisdiction on such contacts alone would not comport with principles of fairness.") Accordingly, Kehm has not shown sufficient facts for the District Court to exercise specific jurisdiction over Chevron.

VII.

For the reasons discussed above, the District Court's decision is affirmed in part and vacated in part for further proceedings consistent with this opinion. Specifically, the District

18

Court properly dismissed the PMPA claim and properly found that it did not have personal jurisdiction over Chevron. However, we remand this case for additional proceedings on the issue of whether Kehm's state law claims were preempted by the PMPA.